(100 South. 55)

No. 25307.

## LIQUIDATORS OF PRUDENTIAL SAVINGS & HOMESTEAD SOC. v. LANGERMANN.

(Oct. 29, 1923. On Rehearing by the Whole Court April 30, 1924.)

*(Syllabus by Editorial Staff.)*

1. **Descent and distribution** ⊜⟿63—Succession; son of first marriage does not hold property bequeathed by mother to father who remarries by inheritance, but because of statute.

Where mother bequeaths property to father who marries again, son of first marriage may claim property, not by inheritance from mother, but because of father's second marriage under Civ. Code, art. 1753, forfeiting father's ownership on remarriage.

2. **Statutes** ⊜⟿241(1)—Penal statutes strictly construed.

Penal statutes must be strictly construed.

3. **Forfeitures** ⊜⟿1—Not favored in law.

The law looks with disfavor upon forfeitures.

4. **Descent and distribution** ⊜⟿84—Succession; conveyance, prior to remarriage, of property inherited from spouse, held to pass legal title as against claim by son of first marriage.

Where husband, prior to remarriage, conveyed property bequeathed to him by wife, grantee conveying it back and retaining vendor's lien, such grantee held legal title, and subsequent dation en paiement to him. after the remarriage, was merely a voluntary retrocession, so that son of first marriage had no right to property under Civ. Code, art. 1753, forfeiting legal title to property received from wife on husband's remarriage, in view of articles 2041, 2045, 2046, 2130, 2561.

Appeal from Civil District Court, Parish of Orleans; Columbus Reid, Judge.

Action by Liquidators of the Prudential Savings & Homestead Society against August Rudolph Langermann. Judgment for defendant, and plaintiff appeals. Reversed and rendered.

U. Marinoni, Jr., and F. Rivers Richardson, both of New Orleans, for appellant.

M. C. Scharff and Sanders, Baldwin, Viosca & Haspel, all of New Orleans, for appellee.

By Division B, composed of Justices DAWKINS, LAND, and LECHE.

LAND, J. This is an action in jactitation converted into a petitory action by defendant admitting the slander of the title asserted by plaintiffs and setting up adverse claim to a two-thirds interest in the property in dispute, which is described as lot No. 4 in the Fourth district of the city of New Orleans in the square bounded by Dryades, South Rampart, First, and Second streets.

Plaintiffs, as defendants in the petitory action, called their vendor, Rudolph Langermann, in warranty, and Langermann called in warranty his vendor, August Rudolph Langermann, defendant herein and plaintiff in the petitory action, to defend the title from August Rudolph Langermann to him to a third interest in said property, as well as to "all and singular the hereditary rights, active and passive, without any exception or reservation, which belong to the vendor in and to the succession of his mother, Georgiana Rachel Lozes, wife of Rudolph Langermann, who died testate on the 4th inst., and of whom this vendor is the sole and forced heir for one-third and the purchaser the universal legatee of two-thirds of her succession."

Mrs. Georgiana Rachel Lozes, the first wife of Rudolph Langermann, died in the city of New Orleans August 4, 1907. By authentic act of date August 22, 1907, August Rudolph Langermann conveyed to his father, Rudolph Langermann, a third interest in said property and the rights above described in and to the succession of his mother. This sale was made with full warranty of title and for a cash consideration of $1,745.38.

On February 21, 1910, Rudolph Langermann sold the same property to the Commonwealth Building & Loan Association, afterwards changed in name to the Prudential Savings & Homestead Society by the amendment of its charter, with full warranty of title and for the cash price of $1,800. This act of sale is notarial in form and was duly registered in the conveyance office of the city of New Orleans February 24, 1910.

His claim to the ownership of a two-thirds interest in this property, set up as a reconventional demand in his answer to the call in warranty, rests solely upon the contention that his father, Rudolph Langermann, married a second time in January, 1915, and that, by virtue of said second marriage, he, as the child of the preceding marriage, became owner of a two-thirds interest in said property, because this interest had been bequeathed to Rudolph Langermann, his father, by the deceased mother of claimant, who denied that the act of sale from him to Rudolph Langermann of date August 22, 1907, included among "all the hereditary rights, active and passive," described therein, the particular right conferred upon him to claim the two-thirds interest in the ownership of the property in dispute, under article 1753 of the Civil Code, now repealed by Act 238 of 1918.

On the other hand, plaintiffs, as the vendee of Rudolph Langermann, assert that said right was embraced within the sale of date August 22, 1907, under the description of "all hereditary passive rights" in and to the succession of his mother.

To this reconventional demand of defendant for a two-thirds interest in said property and for the rents and revenues of same, the plaintiffs on November 4, 1921, filed pleas of estoppel by deed and by warranty; having previously presented on November 3, 1921, a plea of prescription of 10 years, averring that plaintiffs and their authors in title have been in the physical possession of said property, which is improved, under just title,

translative of property, for more than 10 years, and that the rights of said August Langermann, if any, are barred by said prescription. This plea of prescription, as well as the pleas of estoppel by deed and by warranty, were overruled by the lower court. There was judgment as in case of nonsuit in the call in warranty of plaintiffs against Rudolph Langermann, with full reservation to them to institute proper proceedings to recover the amount due. The call in warranty of Rudolph Langermann against August Rudolph Langermann was rejected, and it was held that the property in question must pass to defendant free of any mortgages or alienations by Rudolph Langermann.

We are of the opinion that the plea of prescription is good and should have been sustained for the following reasons:

The plea of prescription in this case is based upon the authentic act of sale, duly recorded February 24, 1910, from Rudolph Langermann to the Commonwealth Building & Loan Association of the property in controversy.

At the date of this sale Rudolph Langermann was a widower, and it is not disputed by August Rudolph Langermann that his father then owned a two-thirds interest in this property and had then acquired the remaining one-third interest in same by virtue of the sale of date August 22, 1907.

Rudolph Langermann was in the actual possession of this property as owner from August 22, 1907, down to the date of the sale to plaintiffs, February 21, 1910. The public records disclosed a title to him with no patent defect upon its face. He had the exclusive ownership of and the exclusive dominion over the whole of this property, and the exclusive right to use and enjoy the same, for his own benefit.

Rudolph Langermann had a legal and transferrable title of ownership of record, and the act of sale of date February 21, 1910, from him to plaintiffs, constitutes unquestionably a just title, as said act, authentic in form, evidences an absolute and unconditional sale to plaintiffs with full warranty of title, and for a valuable consideration.

Plaintiffs, therefore, acquired this property in good faith and by a just title February 21, 1910. R. C. C. arts. 3478, 3479, 3481, 3483, 3484, 3485.

After the sale of this property by Rudolph Langermann to plaintiffs February 21, 1910, they erected a brick store upon it at a cost of $4,850, and on December 30, 1910, resold said property to Rudolph Langermann for a consideration of $6,500; plaintiffs retaining a vendor's lien and special mortgage to secure the payment of the promissory note of Rudolph Langermann, the purchaser, for that amount. In addition to the usual stipulations for payments in sales of this character, the pledge of Langermann's stock as additional security, nonalienation clause, provision for the issuance of executory process, etc., the act evidences a transfer of title to Rudolph Langermann of this lot and the improvements thereon, declaring:

"The purchaser to have and to hold. the said property for himself, his heirs and assigns forever."

The warranty clause, as is usual in such cases, is only against the demands of all persons claiming the property through the association.

The lower court held that the sale of this property by Langermann to plaintiffs and the resale by them to him did not constitute actual sales, but that the two transactions amounted to only a mortgage. In the opinion of the lower court, the sale by Rudolph Langermann to plaintiffs of date February 21, 1910, did not constitute a sufficient basis for the prescription of 10 years, as said sale was not deemed sufficient to transfer the property to plaintiffs.

In this view of the trial judge we cannot concur, as the law on the subject is expressly to the contrary.

It is provided in section 9 of Act 120 of 1902, a building and loan and homestead act:

"That such associations are authorized and empowered to contract and agree with any person to acquire or purchase from such person any property, and afterward to sell or dispose of the same property to a member even though said agreement be made at one and the same time, and such contract and agreement shall not be considered or dealt with *as a loan*, but as *a purchase* or acquisition *by the association*, and then *as a sale* by the association *to such member*, and such association, to secure payment of the amount due by such member, shall have all tne rights, privileges and securities which are now accorded by the law to the vendor of the property." (Italics ours.)

Similar provisions appear in Act 115 of 1888 and in Act 280 of 1916:

In the case of Holloman v. Alexandria & Pineville Building & Loan Association, 137 La. 970, 69 South. 764, we said:

"The defendant sued out executory process on a note for $2,700 signed by Mrs. Mary E. Holloman, with the authorization of her husband, and secured by special mortgage and vendor's privilege on a certain improved lot situated in the city of Alexandria. The transaction between the parties was in the form of a sale by Mrs. Holloman of the lot to the defendant association, and a resale of the same property by the association to Mrs. Holloman for the price of $3,000, represented, in part, by her note for $2,700 bearing interest at rate of 6 per cent. per annum, payable monthly, the whole in accordance with the provisions of the charter and by-laws of the defendant corporation."

The plaintiff Mrs. Holloman enjoined the execution of the writ of seizure and sale in that case on the ground that the application to the defendant association was for a loan to pay the debts of her husband, as said association well knew, and that the two acts of sale were merely simulated sales, or, at least, a disguised mortgage, made to subject the property to the payment of her husband's debts. The court said, in disposing of this contention:

"The plaintiff became a shareholder of the defendant corporation, and the transaction between the parties was not a mortgage, but a purchase and resale, under the provisions of Act No. 120 of 1902, relative to building and loan and homestead associations."

The act of sale from Langermann to plaintiffs of date February 21, 1910, was therefore a purchase by them and a sufficient basis for the plea of prescription of 10 years.

Plaintiffs, under their deed of date February 21, 1910, took possession and erected a brick store on this property at a cost of $4,850, and resold the same with the improvements to Rudolph Langermann on December 30, 1910.

Article 3482 of the Civil Code provides that—

"It is sufficient if the possession has commenced in good faith; and if the possession should afterwards be held in bad faith, that shall not prevent the prescription." C. C. art. 503.

Langermann remained in the actual possession of this property from December 30, 1910, as owner of the whole property, until June or July, after his second marriage in January, 1915, when he moved away, but continued to rent it out at $55 per month, until he resold the property to plaintiffs on May 26, 1919, from which date the plaintiffs have been in possession of said property, renting it out at $55 per month and paying insurance and taxes. The present suit was filed June 8, 1920, and August Rudolph Langermann, defendant herein, filed his answer November 16, 1920, claiming to be the owner of a two-thirds interest in said property, while the act of sale upon which plaintiffs rely as the basis of prescription is of date February 21, 1910.

While it is true that the dation en paiement made by Rudolph Langermann to plaintiffs on May 26, 1919, states that he married

the second time in January, 1915, and that his second wife was still alive and residing with him; yet under article 3482 of the Civil Code, even if the possession of plaintiffs from May 26, 1919, be held as in bad faith, yet plaintiffs' possession having commenced in good faith is sufficient to sustain the prescription of 10 years, as plaintiffs are entitled to tack on to their possession that of their author, Rudolph Langermann, a possessor in good faith. Mala fides superveniens non nocet. Barrow v. Wilson, 38 La. Ann. 209; Leduf v. Bailly, 3 La. Ann. 8; McGowan v. Laughlan, 12 La. Ann. 242; R. C. C. art. 3493.

It is true that the rights of August Rudolph Langermann, plaintiff in petitory action, and defendant herein, came into being in January 1915, when his father married the second time. It is also true that the *prescriptive period was running during this time;* yet he remained quiet and inactive for more than five years after the accrual of his alleged rights. It was only when he was forced to defend this suit brought by plaintiffs that he asserted for the first time, and, too late, any adverse claim to the property in controversy.

The plea of prescription of 10 years is therefore maintained.

For the reasons assigned, the judgment appealed from is annulled, avoided, and reversed, and it is now ordered, adjudged, and decreed that the reconventional demand of defendant August Rudolph Langermann, for a two-thirds interest in the property in controversy and for rents and revenues from same, be and the same is hereby rejected and dismissed. It is further ordered, adjudged, and decreed that there be judgment in favor of the plaintiffs liquidators of the Prudential Savings & Homestead Society maintaining the plea of prescription of 10 years acquirendi causa and decreeing the said liquidators to be the true and lawful owners of the property described in their petition as "a certain lot of ground, together with the buildings and improvements thereon, and all rights, ways, privileges, servitudes and advantages thereunto belonging, or in any wise appertaining, situate in the Fourth district in the city of New Orleans, in square bounded by Dryades, South Rampart, First and Second streets, described by the No. 4, on a certain plan of E. Eisenstream, surveyor, dated May 6, 1868, a copy of which is annexed to an act passed before W. J. Castel, notary public, on August 31, 1868, which lot measures thirty (30) feet front on Dryades street, by one-hundred and fifteen (115) feet, six (6) inches, between equal and parallel lines," being the same property which the said society acquired from Rudolph Langermann on May 26, 1919, by act of sale passed before W. Morgan Gurley, notary public, registered in Conveyance Book No. 308, p. 59. The defendant August Rudolph Langermann to pay all costs.

### On Rehearing.

By the WHOLE COURT.

LAND, J. Article 1753 of the Revised Civil Code provides:

"If a person, who marries a second time, has children of his or her preceding marriage, he or she cannot, in any manner dispose of the property given or bequeathed to him or her by the deceased spouse, or which came to him or her from a brother or sister of any of the children which remain.

"This property becomes, by the second marriage, the property of the children of the preceding marriage, and the spouse, who marries again, only has the usufruct of it."

That this article clearly refers to the disposition of property bequeathed to a surviving spouse, and which is in his or her possession at the date of the second marriage, is made clear by the clause in the second paragraph of the article, "and the spouse who marries again, only has the usufruct of

it." It would be legally impossible for a surviving spouse, after the second marriage, to have the usufruct of property which he had disposed of before the second marriage, and which had been bequeathed to him by the wife of the preceding marriage.

The clause in the second paragraph of said article, "and the spouse who marries again, only has the usufruct of it," also plainly indicates that, prior to the second marriage, the surviving spouse had acquired by the bequest made to him by the wife of the preceding marriage both the ownership and the usufruct of the property so bequeathed, and that the ownership became forfeited by the second marriage, leaving to the surviving spouse "only the usufruct of it."

We therefore have under said article, prior to the second marriage, both the ownership and the usufruct vested in the surviving spouse of the property bequeathed to him, and his immediate dominion over it. Where, then, is the legal impediment to his disposing of the property, before the second marriage, and to his giving to his vendee a good and valid title?

The property acquired under this article by a child of the preceding marriage does not come to him from the testamentary disposition of his mother in favor of the surviving father. Mrs. Langermann had the clear legal right at her death to bequeath to her surviving husband the disposable portion of two-thirds, as her will reserved to her son, the only heir, his légitime of one-third.

The title derived by Langermann, Sr., under the will of his deceased wife to two-thirds of this property, was no less perfect and unconditional at the time, than that derived by the son under the same will.

Had Langermann, Sr., died after disposing of this property to the homestead association, and before his second marriage, it is obvious that a valid and legal title would have vested in the association and that the son would have no claim whatever as to this property from the succession of his father.

[1] It is not by virtue of any right of inheritance from the mother that a son of the preceding marriage can claim the ownership of the property bequeathed to his father, but it is solely because of the second marriage, solely because of the operation of law, that he becomes the owner of such property.

The "second marriage" referred to in article 1753 of the Code is neither a suspensive condition nor a resolutory condition, because there is no antecedent right, or title, or contract to which such condition can be attached. This interpretation is made irrefutable when it is remembered that article 1753 of the Revised Civil Code is an enactment in the nature of a penal statute, and that the second marriage operates as a forfeiture of the ownership of the property by the husband on his marrying again.

In the case of Verret v. Bourgeois, 15 La. 111, 112, this court said:

"This provision [article 1753, old Code, article 227] is evidently taken from the 15th law of Toro, which provides that 'In all cases in which women shall contract a second marriage, they shall be bound to reserve to the children of the first marriage the property they shall hold from the first husband, or shall have inherited from any of the children of the first marriage. The same obligation to reserve shall exist for men who marry a second or third time, so that whatever the law ordains as to women marrying a second time, applies to men who marry a second or third time. * * *'

"This obligation to reserve, which was imposed as a penalty on the surviving spouse who contracted a second marriage, was restricted by several exceptions, which we find laid down in the writers; one of them was, that this obligation to reserve did not extend to property acquired by the children of the first marriage otherwise than by inheritance from the deceased father or mother, whose memory was supposed to have been offended against by such second marriage," etc.

[2, 3] It is elementary that penal statutes must be strictly construed. The law likewise looks with disfavor upon forfeitures.

As the penalty under article 1753 of the Revised Civil Code is imposed solely upon the spouse contracting the second marriage, it is clear that it was never intended that innocent third persons, purchasing the property from the surviving spouse prior to the second marriage, should be affected by any forfeiture of the ownership of the property acquired by them. The very nature of a penalty is that it should be imposed upon the offender alone and that it should not operate retroactively.

Ex post facto legislation by the states is prohibited under the federal Constitution, and the raison d'être of article 1753 of the Code clearly shows that it is not retroactive in its operation, but was intended to punish in the future the spouse contracting a second marriage by forfeiting the ownership of the property bequeathed and in his or her possession at the date of this second marriage, which under the law of Spain was considered an offense against the memory of the deceased spouse.

Article 1753 of the Code was not intended, therefore, primarily to protect, as against the stepmother or the stepfather, the rights of the children of the first marriage as to their patrimony. Whatever interest accrues to them in this respect flows only incidentally from the penalty of forfeiture incurred by the second marriage. They have no antecedent title by virtue of inheritance from their deceased mother or father, as the surviving spouse, before marrying a second time, is vested with such title.

In the Succession of Hale, 26 La. Ann. 202, the court said:

Article 1753 of the Revised Civil Code "was incorporated into our system of laws from the Roman law and the Spanish Codes. It is not found in the Napoléon Code, but is derived from the Justinian Code. De secundis nuptiis. Title 1, Novellæ Constitutiones, 22, chapter 23 [which is translated into English as follows]: 'But if the law discover that children and offspring are in this manner dishonored [by a second marriage], then it deprives her, the mother, as to the matter of ownership of all munificent donations coming from the husband to her, leaving to her only the usufruct. * * * And generally it is said that every form of ownership leaves her in those things which came to her by a former husband.' "

The wife marrying a second time, and being thereby deprived of the ownership, could not be left "only the usufruct," unless she was in possession of the property as owner at the date of the second marriage.

It is therefore clear that not only under the original law as it existed in the Novellæ Constitutions of Justinian, but also under the 15th law of Toro of the Spanish Code, the forfeiture of ownership was a penalty for the second marriage. This construction must necessarily be attached to article 1753 of our Code, which is based upon these ancient laws. That the penalty of forfeiture of ownership should be inflicted upon innocent purchasers of property prior to the second marriage, prior to the commission of the offense entailing such forfeiture upon the wife or husband, marrying a second time, is not only unnatural and unjust, but is clearly contrary to the spirit of the Justinian Code, the Spanish Code, and our own Code, in neither of which do we find any language referring to or affecting the rights of third persons, prior to the second marriage.

In the case of Zeigler v. His Creditors, 49 La. Ann. 144, 21 South. 666, this court was led into the error of declaring that article 1753 of the Civil Code was analogous to the "right of return" provided for in article 1534 (1521) of the present Code. This article declares that—

"The donor may stipulate the right of return of the objects given, either in case of his surviving the donee alone, or in case of his surviving the donee and his descendants. That right can be stipulated for the advantage of the donor alone."

The right of return under article 1534 (1521) is clearly a matter of convention or agreement between the parties. It is expressly stipulated in the act of donation,

which, when recorded, is notice to third persons of the existence of the right of return to the donor of the property donated by him. The public is put upon full notice of the right of return in such cases by the records.

Consequently, it is provided in article 1535 (1522) that—

"The effect of the right of return is, that it cancels all alienations of the property given that may have been made by the donee or his descendants, and causes the property to return to the donor, free and clear of all incumbrances and mortgages," etc.

This article expressly declares that third persons purchasing the property donated with the stipulated right of return to the donor shall be affected, if they buy such property or accept mortgages upon the same.

Articles 1534 (1521) and 1535 (1522) of the Code are found under the head of "Donations Inter Vivos."

Article 1753 of the Code does not provide for any return of property to the donor by agreement or otherwise. It deals exclusively with the status of property, after the death of the husband or wife of the preceding marriage, when such property has been given or bequeathed by the deceased spouse to the survivor, who has contracted a second marriage. This article does not restore the property so given or bequeathed to the estate of the donor or testatrix, but forfeits the ownership of the property in the spouse contracting the second marriage, the donee or legatee, and the property, through such forfeiture, becomes the property of the children of the preceding marriage; the spouse who marries again retaining the usufruct only. The article does not deal in any way with alienations of this property prior to the second marriage, nor does it pretend to regulate the effect of incumbrances which may have been placed thereon before that event. Article 1753 is concerned mainly with the question of the ownership of this property after the second marriage, and with the rights of the spouse marrying again. Its si-

lence as to third persons indicates clearly that such property is considered in law to be vested in the surviving spouse in full and perfect ownership, prior to the second marriage. That third persons are to be affected at all after the second marriage results impliedly and only from the divestiture of the title of the spouse contracting the second marriage.

The result of the decision in the Zeigler Case was to place valuable property out of commerce indefinitely, and to affect the stability of titles to real estate, acquired by bona fide purchasers prior to the second marriage. That decision was made possible only by ingrafting by analogy articles 1534 (1521) and 1535 (1522) of the Civil Code upon article 1753, articles entirely dissimilar in origin and purpose, while the genesis of article 1753 and the reason of its enactment was lost to view in the discussion in that case. In fact, it does not appear from the decision in the Zeigler Case that the court's attention was directed to the penal character of this article of the Code and to the fact that the forfeiture of ownership in the surviving spouse was not, therefore, possible until the second marriage. The question of retroactive penalty as affecting the rights of innocent third persons purchasing the property in good faith and before the second marriage does not seem to have been called to the attention of the court at all. This question may therefore be considered as res nova, notwithstanding the decision in the Zeigler Case.

We will consider the question whether the dation en paiement made by Langermann, Sr., in 1919, to the building association, after his second marriage, was a new title from him and was affected by his said marriage, or whether it was a mere retrocession of the property to said association, his vendor.

"A resolutory condition is implied in all commutative contracts, to take effect, in case either

of the parties do not comply with his engagements," etc. R. C. C. art. 2046.

"If the buyer does not pay the price, the seller may sue for the dissolution of the sale." R. C. C. art. 2561.

"The dissolving condition does not suspend the execution of the obligation; it only obliges the creditor to restore what he has received, in case the event provided in the condition takes place. R. C. C. art. 2045.

"The condition being complied with, has a retrospective effect to the day that the engagement was contracted." R. C. C. art. 2041.

"Obligations are extinguished: * * * By the effect of the dissolving condition," etc. R. C. C. art. 2130.

Under these articles of the Civil Code, this court has held that the fact that the property had passed from the vendee into third hands in no manner abridges the right of the vendor to sue for the rescission of the sale for the nonpayment of the price. Stevenson v. Brown, 32 La. Ann. 462; Ragsdale et al. v. Ragsdale et al., 105 La. 405, 29 South. 906.

Therefore, if Langermann, Sr., had sold this property to his son, after the second marriage in 1919, instead of making a dation en paiement to the building association, said association could have rescinded the sale for nonpayment of the purchase price, while the property was in the hands of the son, a third person.

In the Ragsdale Case, above cited, we said:

"The underlying principle is that until the vendee pays the purchase price he holds by a defeasible title only, and all who deal with him are equally affected. Further, that the rescission of a contract of sale for a cause going back to the origin of the agreement [such as for want of payment of the price] is not considered as an alienation, * * * but rather as a return to the former ownership, which has not ceased to exist, or was only suspended. Insurance Co. v. Packwood, 9 La. Ann. 87; 4 Toullier, Contracts et Obligations Conventionnelles, Nos. 539, 548, 550; Mortee v. Roach's Syndic, 8 La. 83; McKenzie v. Bacon, 41 La. Ann. 9, 5 South. 640."

Article 2045 of the Civil Code declares that the dissolving condition, when accomplished, operates the revocation of the obligation, and places matters in the same state as though the obligation had never existed.

When the condition happens, therefore, the property returns to the vendor free of all alienations and incumbrances imposed by the vendee. Stevenson v. Brown, 32 La. Ann. 461; George v Lewis, 11 La. Ann. 656; Johnson v Bloodsworth, 12 La. Ann. 699; Thompson v. Kilcrease, 14 La. Ann. 340; George v. Knox, 23 La. Ann. 355; Templeman v. Pegues, 24 La. Ann. 537.

The vendor may enforce the resolutory condition by suit to rescind the sale, or the purchaser may do voluntarily what he can be compelled to do by suit; i. e., he may make a voluntary retrocession of the property to the vendor. In either case, the vendor does not acquire a new title from the vendee, but the property reverts back to the vendor, in consequence of the vendee's failure to pay the price, as if no sale had taken place. Chretien v. Richardson, 6 La. Ann. 2; Fulton v. Fulton, 7 Rob. 75; Power, Tutrix, v Ocean Ins. Co., 19 La. 28, 36 Am. Dec. 665.

[4] The second marriage of Langermann, Sr., in the year 1915, therefore, did not have the legal effect of divesting the building association of the title to this property, although such title stood in the name of Langermann, Sr., at that date, and until the year 1919, when, finding himself unable to pay for the property, he made a dation en paiement to said association.

The title of Langermann, Sr., to this property was defeasible. He had not paid his vendor, the building association, the purchase price. The dation en paiement made by him can be viewed, under these circumstances, in no other light than as a voluntary retrocession, in lieu of a compulsory enforcement by suit of the resolutory condition implied in the sale made to him by the building association.

The sale of this property by Langermann to said association took place in the year

1910, and the resale by the association to him was made during the same year.

Under our view of the law, as announced in our analysis of the Zeigler Case, the sale of Langermann, Sr., to the association, prior to his second marriage, was legal and valid. At that date, the son of Langermann, Sr., defendant in this suit, had no right, title, or interest in or to this property, inchoate or otherwise, as the second marriage had not taken place. Langermann, Sr., at the date of the sale by him to the building association, therefore, held the property in controversy in perfect ownership. As the building association in this case holds by virtue of its legal and valid title from Langermann acquired in 1910, and not under any title from him after his second marriage, plaintiffs are entitled to be decreed the true and lawful owners of this property.

It therefore becomes unnecessary for us to pass upon the plea of prescription of 10 years acquirendi causa tendered by plaintiffs.

For the reasons herein assigned, our former decree is reinstated and made the judgment of the court.

O'NIELL, C. J., and ST. PAUL, J., concur in the decree.

ROGERS, J., concurs in decree for reasons set forth in opinion on rehearing.